Jamie Rucker (JCR-6767)
National Labor Relations Board
Region 2
26 Federal Plaza, Room 3614
New York, New York 10278-0104
(212) 264-0300

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------X
**CELESTE J. MATTINA, Regional Director,**
**Region 2 of the National Labor**
**Relations Board, for and on behalf of**
**The NATIONAL LABOR RELATIONS BOARD,**

                        **Petitioner**

        **v.**                                              08 Civ._____

**SAIGON GRILL GOURMET RESTAURANT, INC. &**
**SAIGON SPICE, INC. d/b/a SAIGON GRILL**                 J._____
**RESTAURANT**

                        **Respondent**                          **ECF**
-----------------------------------------X


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PETITION FOR TEMPORARY INJUNCTION UNDER SECTION 10(J)**
**OF THE NATIONAL LABOR RELATIONS ACT**

**TABLE OF CONTENTS**

I.   STATEMENT OF THE CASE ......................................1
II.  PROCEDURAL POSTURE .........................................2
III. FACTS ......................................................4
     A.  The Employer's Operations .............................4
     B.  The Employees' Organizational and Concerted, Protected
     Activity ...................................................6
     C.  The Employer's Response to the Employees' Activities ......8
IV.  STATUTORY STANDARD FOR INJUNCTIVE RELIEF .................12
V.   REASONABLE CAUSE ANALYSIS ................................13
     A.  Overview .............................................13
     B.  The Discharges of the Delivery Workers Violated Section
     8(a)(1) of the Act .......................................15
          1.  The Delivery Workers Engaged in Protected Activities....16
          2.  Respondent Knew of the Employees' Protected Activities and
          Exhibited Animus Toward Those Activities ...................18
          3.  Respondent Discharged the Delivery Workers in Response to
          Their Protected Activities ................................20
     C.  *Darlington* and Its Progeny Do Not Affect the Unlawfulness
     of Respondent's Discharge of the Delivery Workers ...........24
          1.  Darlington and Its Progeny Do Not Apply to the Present
          Case ......................................................25
          2.  Even Under Darlington, Respondent's Discharge of Its
          Delivery Workers Was Unlawful .............................28
VI.  JUST AND PROPER ANALYSIS .................................32
VII. CONCLUSION AND REMEDY ...................................38

## TABLE OF AUTHORITIES

**Federal Cases**

*Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744 (9th Cir. 1988) ..34, 36

*Ahearn v. McGuire*, 1994 WL 721371 (W.D.N.Y. 1994) .............34

*Asseo v. Centro Medico Del Turabo, Inc.*, 900 F.2d 445 (1st Cir. 1990) ................................................................38

*Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001) 14, 36

*Blyer v. Domsey Trading Corp.*, 139 LRRM 2289 (E.D.N.Y. 1991) ..36, 38

*Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union (ILGWU)*, 494 F.2d 1230 (2d Cir. 1974) .........14

*Eastex, Inc. v. NLRB*, 437 U.S. 556 (1978) .....................17

*Eisenberg v. Lenape Products, Inc.*, 781 F.2d 999 (3d Cir. 1986) 35

*Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902 (3rd Cir. 1981) .........................................34, 37

*Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147 (D. Mass. 1983), aff'd per curiam 725 F.2d 664 (1st Cir. 1983) ..............13

*H. Wilson Corp. v. NLRB*, 414 F.2d 1345 (3d Cir. 1969), cert. denied 397 U.S. 935, 90 S.Ct. 943, 24 L.Ed.2d 115 (1970) .....35

*Kaynard v. Mego Corp.*, 633 F.2d 1026 (2d Cir. 1980) ....13, 14, 32

*Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047 (2d Cir. 1980) ................................................................passim

*McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237 (2d Cir. 1962) .............13

*Misericordia Hosp. Medical Ctr. v. NLRB*, 623 F.2d 808 (2d. Cir. 1980) ...........................................................17

*Morio v. North American Soccer League*, 632 F.2d 217 (2d Cir. 1980) ...........................................................32

*NLRB v. American Geri-Care*, 697 F.2d 56 (2d Cir. 1982), cert. denied 461 U.S. 906 (1983) ...................................22

*NLRB v. Atlas Microfilming, etc.*, 753 F.2d 313 (3d Cir. 1985) ..34

*NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559 (7th Cir. 1996), cert. denied 519 U.S. 1055 (1997) ........................13, 33, 37

*NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208 (2d Cir. 1980) ......33

*Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874 (3d Cir. 1990) ....35

*Purolator Armored, Inc. v. NLRB*, 764 F.2d 1423 (11th Cir. 1985) 30

*Pye v. Excel Case Ready*, 238 F.3d 69 (1st Cir. 2001) ........33, 36

*Schaub v. West Michigan Plumbing & Heating, Inc.*, 250 F.3d 962 (6th Cir. 2001) ...........................................36

*Seeler v. The Trading Port, Inc.*, 517 F.2d 33 (2d Cir. 1975) ..12, 13, 14, 32

*Sharp v. Webco Indus., Inc.*, 225 F.3d 1130 (10th Cir. 2000).....36

*Silverman v. J.R.L. Food Corp., d/b/a Key Food*, 196 F.3d 334, 335 (2d Cir. 1999) .......................................13, 14, 24

*Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054 (2d Cir. 1995) ............................14, 33

*Silverman v. Reinauer Transportation*, 130 LRRM 2505 (S.D.N.Y. 1988), *aff'd per curiam* 880 F.2d 1319 (2d Cir. June 23, 1989) 36

*Silverman v. Whittal & Shon, Inc.*, 125 LRRM 2150 (S.D.N.Y. 1986) ...............................................................33

*Textile Workers Union of America v. Darlington Mfg. Co.*, 380 U.S. 263 (1965) ...............................................passim

**Cases**

*Allied General Services, Inc.*, 329 NLRB 568 (1999) .............27

*American Wire Products*, 313 NLRB 989 (1994) ....................16

*Bob's Big Boy Family Restaurants*, 264 NLRB 1369 (1982) .....25, 26

*Cub Branch Mining*, 300 NLRB 57 (1990) .........................24

*Darlington Mfg. Co.*, 165 NLRB 1074 (1967) .....................29

*Davey Roofing, Inc.*, 341 NLRB 222 (2004) ......................21

*Dentech Corp.*, 294 NLRB 924 (1989) ............................31

*Electrical Workers, IBEW Local 266-B (Salt River Valley Water Users Assoc.)*, 99 NLRB 849, 853 (1952), enfd. as modified by *Salt River Valley Water Users Assoc. v. NLRB*, 206 F.2d 325 (9th Cir. 1953) ...................................................17

*G & T Terminal Packaging Co.*, 326 NLRB 114 (1998) ......23, 26, 28

*Gaetano & Associates*, 344 NLRB No. 65 (2005) ..................21

*George Lithograph Co.*, 204 NLRB 431 (1973) ....................30

*Le Madri Restaurant*, 331 NLRB 269 (2000) ......................17

*Lear Siegler, Inc.*, 295 NLRB 857 (1989) .......................25

*Manno Electric*, 321 NLRB 278 (1996) ...........................15

*McGaw of Puerto Rico*, 322 NLRB 438 (1996) .....................16

*Metropolitan Transportation Services*, 351 NLRB No. 43 (2007) ...23

*North Carolina License Plate Agency No. 18*, 346 NLRB No. 30 (2006) ...................................................17

*Plaza Properties of Michigan*, 340 NLRB 983 (2003) .............28

*Purolator Armored, Inc.*, 268 NLRB 1268 (1984), *enfd.* 764 F.2d 1423 (11th Cir. 1985) ......................................29, 30

*U Ocean Palace Pavilion, Inc.*, 345 NLRB No. 97 (2005) ......17, 20

*We Can, Inc.*, 315 NLRB 170 (1994) .............................27

*William Contracting, Inc.*, 309 NLRB 433 (1992) ................17

*Wright Line*, 251 NLRB 1083 (1980), *enf'd.*, 662 F.2d 899 (1st Cir. 1981) ...................................................15

**Statutes**

29 U.S.C. § 157...........................................15, 17, 18

29 U.S.C. § 158(a)(1) ........................................1, 15

29 U.S.C. § 160(j) ..............................................1

## I. STATEMENT OF THE CASE

Celeste J. Mattina, Regional Director for Region 2 of the National Labor Relations Board, herein called the Board, has petitioned this court, for and on behalf of the Board, pursuant to Section 10(j) of the National Labor Relations Act, (61 Stat. 149; 29 U.S.C. Sec. 160(j)), herein called the Act, for appropriate injunctive relief pending the final disposition of the matters involved herein pending before the Board on the Amended Complaint and Notice of Hearing of the General Counsel of the Board in Case No. 2-CA-38252, alleging that Saigon Gourmet Restaurant, Inc. and Saigon Spice, Inc., herein Respondent or Saigon Grill or the Employer, have engaged in, and are engaging in, unfair labor practices in violation of Section 8(a)(1) of the Act.

The petition herein is predicated on Petitioner's conclusion that there is reasonable cause to believe that Respondent has engaged in the unfair labor practices charged. Having reached this conclusion, the Board is authorized under Section 10(j) of the Act to petition the Court for a temporary injunction against the continuation of such unfair labor practices, and the Court has jurisdiction to grant such relief when it is deemed to be just and proper.

In the instant case, the belief that Respondent has violated the Act as alleged is based upon the below-summarized evidence, which is supported by testimony and exhibits adduced at

a formal hearing before an Administrative Law Judge conducted on December 3, 5, and 6, 2007, and the decision of the Administrative Law Judge, issued February 11, 2008. The record of the hearing, comprising the transcript and exhibits, is attached to the petition as Exhibit A. The decision of the Administrative Law Judge is attached to the petition as Exhibit B.

Interim injunctive relief is necessary to prevent Respondent from achieving its unlawful objective, to protect the Board's remedial powers, and to further the Act's purpose of promoting peaceful collective bargaining.

## II.  PROCEDURAL POSTURE

On May 14, 2007,[1] 318 Restaurant Workers Union ("the Union") filed the charge in Case No. 2-CA-38252. This charge, as amended on July 30, alleges, *inter alia*, that Respondent violated Section 8(a)(1) of the Act by:  (i) discharging its delivery workers employed at Respondent's facilities at 620 Amsterdam Avenue and 93 University Place and (ii) ceasing its delivery operations at both locations. Copies of the charge and amended charge, together with their respective affidavits of service, are part of the record of the unfair labor practice hearing held in this matter before Administrative Law Judge Raymond P. Green on December 3, 5, and 6, at G.C. Exhs. 1(a)–1(d).[2]

---

[1] All dates are in 2007, unless otherwise specified.
[2] The record of the underlying administrative hearing is attached to the Petition as Exhibit A. All citations to the record of that hearing are therefore to the appropriate portion of Exhibit A. Citations to the transcript will be made as "Tr. X:Y," where X and Y denote the

The aforesaid charge was referred to the Regional Director of Region 2 of the Board. Following an investigation of the allegations, the General Counsel of the Board, by the Regional Director, issued a Complaint and Notice of Hearing in Case No. 2-CA-38252 on about September 28. Copies of the Complaint and Notice of Hearing and its respective affidavit of service are included as G.C. Exhs. 1(e) and 1(f). On or about October 4, Respondent, by its Counsel, filed an Answer to the Complaint and Notice of Hearing. A copy of the Answer is included at G.C. Exh. 1(g). An Order Rescheduling Hearing was issued on about October 16. Copies of the Order and its corresponding affidavit of service are attached at G.C. Exhs. 1(h) and 1(i). An Amended Complaint and Notice of Hearing issued on about November 8. Copies of the Amended Complaint and Notice of Hearing and its corresponding affidavit of service are attached at G.C. Exhs. 1(j) and 1(k). On about November 12, Respondent, by its Counsel, filed an Answer to the Amended Complaint and Notice of Hearing. A copy of the Answer is attached as G.C. Exh. 1(l).

On December 3, 5, and 6 a hearing regarding the allegations of the Amended Complaint was held before Administrative Law Judge Raymond P. Green. Petitioner and Respondent were given the opportunity to and did (i) present testimony and other evidence and (ii) cross-examine witnesses.

---

transcript page and line numbers, respectively. Reference to exhibits will be "G.C. Exh. X," "R. Exh. X," or "U. Exh. X" where X denotes the exhibit number, and "G.C.," "R.," and "U." identify the exhibit as submitted by the General Counsel, Respondent, or Union, respectively.

Following the submission of briefs, Administrative Law Judge Raymond Green issued a decision dated February 11, 2008. A copy of that decision is attached to the Petition as Exhibit B.[3]

Petitioner now seeks interim injunctive relief to preserve the Board's ability to remedy Respondent's unfair labor practices. In particular, Petitioner seeks the interim reinstatement of discriminatees Jian Yun Chen, Yu Ming Yu, Ming Hua Chen, Li Qiang Lin, Chen Shu Hui, and Chen Guo Jin, restoration of the Respondent's delivery services, and a cease and desist order.

## III. **FACTS**

### A. The Employer's Operations

Simon Nget ("S. Nget") is the sole officer and owner of both Saigon Gourmet Restaurant, Inc. and Saigon Spice, Inc. (Tr. 14:14-21, 15:12-15, 20:17-23, and 24:5-25 (testimony of S. Nget).) Both facilities operate under the name "Saigon Grill" and are located in New, York New York; the first at 620 Amsterdam Ave., at 90th St., the latter at 93 University Place, near 12th St. (Tr. 15:7-19 and 14:14-17 (S. Nget testimony).)

Simon Nget is the sole person with the authority to set employees' wage rates and hire or fire employees. (Tr. 20:24-21:6 and 26:21-27:5 (S. Nget testimony).) He also sets the workers' hours. (G.C. Exh. 6 at 40:17-22.[4])

---

[3] As part of that order, the Administrative Law Judge granted General Counsel's motion to correct the record in various ways. Those amendments will be noted where applicable.
[4] G.C. Exh. 6 is the transcript of a deposition of Simon Nget taken November 2, 2007. Citations to that exhibit will henceforth refer to

The Amsterdam Ave. site currently employs about 65 workers, while about 40 employees work at the University Place facility. (Tr. 17:18-24 and 25:8-12 (S. Nget testimony).)   Additionally, the Amsterdam Ave. and University Place restaurants formerly employed delivery persons. (Tr. 29:19-30:1 (S. Nget testimony).) Some of those delivery people worked at both the Amsterdam Ave. and University Place facilities.   (Tr. 71:19-24 (S. Nget testimony that at least one delivery person worked at both sites); Tr. 238:2-9 (Qi Hua Lian testimony).)

The Amsterdam Ave. facility seats about 300 people for at-table service, (Tr. 18:16-19 (S. Nget testimony)), provides take-out service, (Tr. 18:20-24 (S. Nget testimony)), and, until March 4, provided delivery service as well, (Tr. 22:19-23:6 (S. Nget testimony)).  When the Amsterdam Ave. facility offered both take-out and delivery, the former accounted for only approximately ten percent (10%) of its revenues, (Tr. 30:13-19 (S. Nget testimony)), while delivery constituted a quarter (25%) of the restaurant's business, (Nget Depo. 84:7-14; Tr. 23:20-24 (S. Nget testimony)).  The University Place facility is a bit smaller; it seats approximately 250 customers.  (Tr. 25:23-26:4 (S. Nget testimony).)  That restaurant also offers food for take-out and used to provide a delivery service.  (Tr. 26:16-17 and 29:14-16 (S. Nget testimony).)  Delivery accounted for a smaller part of the business at University Place than it did at Amsterdam Ave. (Nget Depo. 84:15-20.)

---

it as "Nget Depo. X:Y," where X and Y refer to the cited page and line

The delivery employees were paid less than $3.00 per hour, plus tips. (*E.g.*, Tr. 155:2-10 (Ke Yu Guan testimony that he was paid $378 a month for a 33 hour work week); Tr. 198:6-19 (Li Bing Xing testimony that he was paid $560 per month for a 68.5 hour week).) Other employees at both the Amsterdam Ave. and University Pl. facilities were, like the delivery workers, also earning less than minimum wage. (Tr. 276:17-277:12 (stipulation that witness would testify that she worked at University Pl. and was paid less than minimum wage until April 2007, when her wages were raised to above the minimum); Tr. 265:12-271:4 (testimony of Amsterdam Ave. worker Augustina De Jesus that she was paid $775 for 144 hours of straight time, approximating $4.40 per hour after accounting for overtime, until April 2007, when her hours were reduced to 47 per week, bringing her pay rate to approximately $7.67 per hour, higher than the New York State minimum wage rate of $7.15 per hour for non-tipped employees).)

## B. The Employees' Organizational and Concerted, Protected Activity

On about February 4, a few of the Amsterdam Ave. delivery workers went to speak with Lin Song, a Union representative. (Tr. 156:23-157:15 (Ke Yu Guan testimony).) The group spoke about the possibilities of bringing a minimum wage suit against the Employer and joining the Union. (Tr. 157:18-20 (Ke Yu Guan testimony).)

Later that same day, at around 5:00 p.m., delivery employee Ke Yu Guan met with most of the other Amsterdam delivery workers

---

numbers of the transcript.

immediately outside Respondent's Amsterdam Ave. facility and discussed the possibilities of joining the Union and participating in a wage and hour suit against the Employer for alleged minimum wage violations. (Tr. 158:3-159:4 (Ke Yu Guan testimony).)

Also in February, Ke Yu Guan spoke by telephone with some of the delivery workers at the University Pl. facility, including De Shun Chi. (Tr. 217:14-218:17 (De Shun Chi testimony).) Ke Yu Guan told De Shun Chi that they might be able to sue the Employer for minimum wage violations and asked whether he and the other delivery workers were interested in joining the Union. (*Id.*)

Qi Hua Lian and Di Shun Chi discussed the possibility of suing the Employer with other University Pl. facility workers, including some employees who did not work as delivery persons, a number of times during February. (Tr. 218:6-11 (De Shun Chi testimony); Tr. 233:23-237:21 (Qi Hua Lian testimony).)

On February 28, Ke Yu Guan and a few other delivery workers visited Lin Song at the Union's offices again. (Tr. 159:5-15 (Ke Yu Guan testimony).) Those present signed Union authorization cards. (*Id.* at 159:16-160:22; G.C. Exh. 4 (authorization cards).) Lin Song told the workers that he would help them with a minimum wage lawsuit. (Tr. 161:5-162:5 (Ke Yu Guan testimony); G.C. Exh. 5 (consent to sue).)

Around 5:00 or 6:00 p.m. on March 2, almost all of the Amsterdam Ave. delivery people met out in front of the Amsterdam Ave. facility. (Tr. 162:15-164:13 (Ke Yu Guan testimony); Tr.

200:10-204:11 (Li Bing Xing testimony).) Ke Yu Guan showed the others a document, written in Chinese, which would make signatories participants in a wage and hour suit against the Employer. (Tr. 162:15-164:13 (Ke Yu Guan testimony); Tr. 200:10-204:11 (Li Bing Xing testimony); G.C. Exh. 5.)

While the group was meeting and workers were signing the lawsuit authorization form, Respondent owner S. Nget and his wife arrived and parked at a meter directly in front of the restaurant. (Tr. 204:14-25 (Li Bing Xing testimony); Tr. 163:4-164:13 (Ke Yu Guan testimony).)

## C. The Employer's Response to the Employees' Activities

Later that same evening, the owner's wife, Michelle Nget, told the delivery workers that they should remain after work for a meeting. (Tr. 164:23-165:13 (Ke Yu Guan testimony); Tr. 205:15-21 (Li Bin Xing testimony); Tr. 70:10-71:10 (S. Nget testimony).)[5] At around 8:00 p.m. that evening, Ke Yu Guan overheard owner Simon Nget speaking to his wife Michelle and two others. (Tr. 165:14-167:7 (Ke Yu Guan testimony).) Mr. Nget said that he had seen the delivery workers signing a piece of paper and that he believed they intended to sue the restaurant. (*Id.*) Notably, Simon Nget never denied making that remark,

---

[5] Simon Nget contends that he called this meeting in response to a conversation he had with two delivery workers, Xian Y. Chen and Jian Lee Lin, who allegedly approached Mr. Nget at around 9:15 p.m., outside of the restaurant. (Tr. 66:18-68:23 (S. Nget testimony).) Those workers allegedly told Mr. Nget that nine deliverymen at Our Place restaurant had sued that restaurant for wages and tips, and settled for $900,000. (G.C. Exh. 1(i), ¶ 5 (Resp. Answer to amended complaint).) The two deliverymen who allegedly spoke to Mr. Nget said that if he did not settle with them, they would initiate their own suit. (*Id.*)

though he we was the last witness to testify and he did deny a number of other statements attributed to him. (*See* Tr. 293:20-300:7 (S. Nget testimony).)

The meeting that owner Simon Nget had scheduled was held in the back of the Amsterdam Ave. facility at 11:30 p.m. or 12:00 a.m. on March 2-3, with Mr. Nget, his wife Michelle, and the 22 Amsterdam Ave. delivery workers in attendance. (Tr. 70:24:71:10 (S. Nget testimony); Tr. 167:8-13 (Ke Yu Guan testimony).) Simon Nget opened that meeting by asking the workers what it was he had seen them signing out in front of the restaurant earlier that day. (Tr. 167:19-168:17 (Ke Yu Guan testimony); *see also* Tr. 206:12-13 (Li Bing Xing testimony).) Mr. Nget went on to say that he was aware of what had been happening at two other restaurants (Ollie's and Our Place) and that he did not want Saigon Grill to be the third one. (Tr. 206:13-15 (Li Bing Xing testimony); Tr. 168:10-15 (Ke Yu Guan testimony).) Nget had two documents with him that he did not give to the workers, but which he said they had to sign in order to get a raise to $35 a day.[6] (Tr. 169:3-7 (Ke Yu Guan testimony); Tr. 206:18-207:12 (Li Bing Xing testimony).) Mr. Nget said that if the workers signed the document he had, all that had happened in the past would be over

---

[6] In its response to a subpoena from counsel for the General Counsel, Respondent admitted that Simon Nget's offer to raise the delivery workers' wages was conditioned upon withdrawal of their demand for overtime wages. (G.C. Exh. 3, ¶ 9.) This is consistent with the testimony of Ke Yu Guan and Li Bing Xing that Mr. Nget asked the workers to sign a document that would put to rest what had happened in the past, but is inconsistent with Simon Nget's testimony that he did not ask the delivery workers to sign documents at the March 2nd meeting. (Tr. 294:1-6 S. Nget testimony).)

and done with. (Tr. 168:24-169:16 (Ke Yu Guan testimony); Tr. 206"8-207:2 (Li Bing Xing testimony).) With employee Ke Yu Guan acting as spokesperson, the delivery workers refused to sign the documents, saying that they needed to review the document(s) they were being asked to sign. (Tr. 169:8-16 (Ke Yu Guan testimony); Tr. 207:20-208:14 (Li Bing Xing testimony).) In response to the workers' refusal to sign the proffered documents, Simon Nget's wife, Michelle, told the delivery workers that they did not need to show up for work anymore and that they should take their bikes[7] and personal belongings as they left.[8] (Tr. 172:18-25 (Ke Yu Guan testimony); Tr. 208:18-21 (Li Bing Xing testimony).)

Sometime during the morning of March 3, Michelle Nget spoke to Qi Hua Lian and asked, albeit indirectly, whether he was aware of what had happened. (Tr. 239:6-10 (Qi Hua Lian testimony).) Later the same day, at the University Place facility, the owner spoke to some of the delivery workers on duty. (Tr. 239:16-244:24 (Qi Hua Lian testimony).) First, at a one-on-one meeting held at around 7:00 or 8:00 p.m., Simon Nget told Qi Hua Lian he could get a raise of $300 a month in exchange for signing a document. (Tr. 239:16-241:9 (Qi Hua Lian testimony).) Qi Hua

---

[7] The delivery workers supplied whatever mode of transportation they wanted to use, but were allowed to store bicycles at the restaurant, if they wanted. (Tr. 56:3-11 and 75:20-76:5 (S. Nget testimony).)
[8] The independent and mutually corroborative accounts of Ke Yu Guan and Li Bing Xing set forth above are inconsistent with Mr. Nget's account of why he called this meeting. For instance, Mr. Nget's account provides no explanation of why both workers testified that Mr. Nget spoke about not only Our Place restaurant, but also Ollie's, or why both workers testified that Mr. Nget asked what they had been signing outside the restaurant that evening.

Lian refused to sign the document because he did not understand its content; Simon Nget said he would deny the conversation and also referred to the possibility of Qi Hua Lian suing the restaurant. (Tr. 241:16-22 (Qi Hua Lian testimony).)

Later the same night, at around 10:00 p.m., Simon Nget spoke to Qi Hua Lian again, this time together with another delivery worker referred to as "A." (Tr. 242:3-243:25 (Qi Hua Lian testimony).) In that meeting, the owner asked both Qi Hua Lian and "A" to sign a document; both refused. (*Id.*) The owner also asked them if they intended to join others in protest in front of the restaurant and expressed his animus toward such possible protests, saying that if he saw any of the workers do so, he would "cough up blood." (*Id.*) When Simon Nget asked Qi Hua Lian whether he would join others in protesting, Lian did not answer. (*Id.*)

The following day, Sunday, March 4th, Simon Nget told Qi Hua Lian and two other workers that he was terminating the University Place delivery workers as well. (Tr. 79:22-80:11 (S. Nget testimony).) At around 8:00 p.m. on Monday, March 5th, Michelle Nget gave all of the University Place delivery workers their final pay and some severance, told them there would be no more work for them, and said they should take their personal belongings home. (Tr. 221:14-223:6 (De Shun Chi testimony).)

Shortly after firing the delivery workers, Simon Nget told a newspaper that he intended to resume delivery as soon as he could do so without the workers collectively seeking to improve

their wages. (Tr. 105:9−106:10 (S. Nget admission that he told newspaper reporter in May that he would reinstitute delivery service if he could do it in a "normal way," *viz*. without claims by workers for better wages).

### IV.  **STATUTORY STANDARD FOR INJUNCTIVE RELIEF**

Section 10(j) of the Act authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. Congress recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint and thereby render a final Board order ineffectual. *See Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980); *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975), citing S.Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted at *Legislative History of the Labor Management Relations Act of 1947*, 44, 433 (Government Printing Office 1985). Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. *See, e.g., Seeler v. The Trading Port, Inc.*, 517 F.2d at 37-38.

To resolve a Section 10(j) petition, a district court in the Second Circuit considers only two issues: whether there is "reasonable cause to believe" that a respondent has violated the Act and whether temporary injunctive relief is "just and

proper." *See, e.g., Silverman v. J.R.L. Food Corp., d/b/a Key Food*, 196 F.3d 334, 335 (2d Cir. 1999) and the cases cited therein.

## V. REASONABLE CAUSE ANALYSIS

### A. Overview

In determining whether there exists reasonable cause to believe that the Act has been violated, the district court may not decide the merits of the case. *See Kaynard v. Mego Corp.,* 633 F.2d 1026, 1032-1033 (2d Cir. 1980). Rather, the court's role is limited to determining whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals." *Kaynard v. Mego Corp., supra* at 1033, *quoting McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237, 242 n.17 (2d Cir. 1962). The district court should not resolve contested factual issues; the General Counsel's version of the facts "should be given the benefit of the doubt," *Seeler v. The Trading Port, Inc.*, 517 F.2d at 37, and together with the inferences there from, "should be sustained if within the range of rationality." *Kaynard v. Mego Corp., supra* at 1031. The district court also should not attempt to resolve issues of credibility of witnesses. *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1051-1052 n. 5. *See also NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1570-1571 (7th Cir. 1996), *cert. denied* 519 U.S. 1055 (1997); *Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147, 1150-1151 n. 2 (D. Mass. 1983), *aff'd per curiam* 725 F.2d 664 (1st Cir. 1983).

Similarly, on questions of law, the district court "should be hospitable to the views of the [General Counsel], however novel." *Kaynard v. Mego Corp.*, supra at 1031, *quoting Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union (ILGWU)*, 494 F.2d 1230, 1245 (2d Cir. 1974). The General Counsel's legal position should be sustained "unless the [district] court is convinced that it is wrong." *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1051. *Accord, Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054, 1059 (2d Cir. 1995) ("appropriate deference must be shown to the judgment of the NLRB and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed").

The decision of the Administrative Law Judge strengthens Petitioner's reasonable cause to believe that that Respondent violated Section 8(a)(1) of the Act by discharging the delivery workers and terminating its delivery operations. *See Silverman v. J.R.L. Food Corp.*, supra, 196 F.3d at 337 (district court must give "appropriate deference" to findings of Board ALJ); *Seeler v. Trading Port*, supra, 517 F.2d at 37 n.7 (ALJ decision "bolstered" petitioner's finding of reasonable cause); *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001) ("the ALJ's factual and legal determinations supply a useful benchmark" to assess petitioner's likelihood of success on the merits).

As described below, reasonable cause exists to believe that Respondent violated Section 8(a)(1) of the Act by discharging all of its delivery workers and ceasing delivery operations.

**B. The Discharges of the Delivery Workers Violated Section 8(a)(1) of the Act**

Section 8(a)(1) of the Act provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7" of the Act.  29 U.S.C. § 158(a)(1).  Section 7 of the Act gives employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection…"  29 U.S.C. § 157. Section 8(a)(1) of the Act therefore limits the manner in which employers may respond to those activities protected by Section 7.

In order to establish that an employer's discharge of a worker violated Section 8(a)(1) of the Act, the General Counsel must demonstrate that the worker was engaged in protected activity, that the employer had knowledge of such activity, that the employer exhibited animus or hostility toward that activity, and that the employee's protected activity was a "motivating factor" in the employer's decision to take adverse action against the employee.  *Wright Line*, 251 NLRB 1083, 1089 (1980), *enfd.*, 662 F.2d 899 (1st Cir. 1981); *Manno Electric*, 321 NLRB 278, 281 (1996).  Where an employer engages in a "mass discharge," it is unnecessary to establish that the employer had specific knowledge

15

of the protected activities of each alleged discriminatee or even that every discharged worker was engaged in protected activity. *American Wire Products*, 313 NLRB 989, 994-995 (1994) ("when circumstances demonstrate a mass discharge for unlawful purposes, as here, it is unnecessary to show employer knowledge of union activity of each specific discharge"); *McGaw of Puerto Rico*, 322 NLRB 438, 451 (1996) ("where the central aim of a layoff is to discourage union activity or to retaliate against employees because of the union activities of some, as the General Counsel alleges here, the layoff will be found to be unlawful even though employees who might have been neutral or even opposed to the Union are laid off with their counterparts").

Petitioner believes it is inapplicable to the present circumstances, but where a mass discharge constitutes a "partial closing"---as that term is used in *Textile Workers Union of America v. Darlington Mfg. Co.*, 380 U.S. 263 (1965) and its progeny---a further showing must be made that the employer closed a part of its business with the intent to discourage concerted activity at other parts of the business and that such effect was reasonably foreseeable, given the relationship of the closed part to the remainder of the business. *See Darlington*, *supra*, 380 U.S. at 275-276.

### 1. The Delivery Workers Engaged in Protected Activities

It is well-established that conduct preparatory to the filing of a Fair Labor Standards Act ("FLSA") suit is concerted activity for mutual aid or protection encompassed and protected

by Section 7 of the Act. *Electrical Workers, IBEW Local 266-B (Salt River Valley Water Users Assoc.)*, 99 NLRB 849, 853 (1952) (action of single individual in circulating petition to make that individual the authorized agent to collect wages dues under the Fair Labor Standards Act held to be protected by Sec. 7), enfd. as modified by *Salt River Valley Water Users Assoc. v. NLRB*, 206 F.2d 325 (9th Cir. 1953); *see generally Eastex, Inc. v. NLRB*, 437 U.S. 556, 563-568 and n.15 ((1978) ("it has been held that the 'mutual aid or protection' clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums"; citing cases); *see also Misericordia Hosp. Medical Ctr. v. NLRB*, 623 F.2d 808, 812-813 (2d. Cir. 1980) (participation in preparing report critical of hospital staffing levels constitutes protected activity).

Concerted filing and/or maintenance of an FLSA or New York labor law suit is activity protected by Section 7 of the Act. *U Ocean Palace Pavilion, Inc.*, 345 NLRB No. 97 (2005) (Board notes that employer statement that it would hire applicants if they dropped wage and hour suit was virtual admission of unlawful motivation); *Le Madri Restaurant*, 331 NLRB 269, 275-276 (2000). The same is true when employees inform an employer that they intend to seek redress for complaints about working conditions. *North Carolina License Plate Agency No. 18*, 346 NLRB No. 30 (2006); *Williams Contracting, Inc.*, 309 NLRB 433, n.2 (1992).

Under the foregoing standards, there can be little doubt that the delivery workers' activities---at both Amsterdam Ave. and University Pl.---in discussing pursuit and/or initiation of a collective wage and hour suit was protected by Section 7 of the Act.

    2. **Respondent Knew of the Employees' Protected Activities and Exhibited Animus Toward Those Activities**

Simon Nget's account of what happened on the evening of Friday, March 2, 2007 is implausible and contradicted by the mutually corroborative testimony of employees Ke Yu Guan and Li Bing Xing.  But on either the workers' account or the admissions of Simon Nget, Respondent was aware of protected activity by the delivery workers as a group.

According to the uncontradicted testimony of Ke Yu Guan, Simon Nget told his wife and some others that he believed the workers were going to sue him.  (Tr. 165:14-167:7 (Ke Yu Guan testimony).)  Simon Nget's references to Our Place and Ollie's' restaurants later that evening establish that Nget was aware of the wage and hour activity at those restaurants.  (Tr. 168:12-15 (Ke Yu Guan testimony that at the meeting the night of March 2, S. Nget told the delivery workers, "I heard from other people the first place is going to be Ollie and the third place is going to be Saigon.  The two of them they already gathered and they already sued the owner already.  I will not allow [a] thing like this to happen at my store"); Tr. 206:12-15 (Li Bing Xing testimony that S. Nget told the employees, "The stuff that you

18

guys was doing outside, I saw it.  Out there something happens to Ollie and Ji Shun [Our Place].[9]  The delivery people sued.  I do not want the third person to happen to [be] me").)  These statements by S. Nget establish both his knowledge of the workers' intentions to bring a wage and hour claim and his hostility toward that activity.

Even if Simon Nget's account is credited over the mutually corroborative testimony of Li Bing Xing and Ke Yu Guan, Mr. Nget's story constitutes an admission that he was aware that the delivery workers intended to bring wage and hour claims against Saigon Grill.  According to Respondent's Answer to the Amended Complaint, two delivery workers told Simon Nget that unless Respondent settled on terms similar to those adopted at Our Place restaurant in its settlement of a wage and hour action, the workers would initiate their own lawsuit.  That claim constitutes an admission that Respondent was aware the delivery workers were attempting to improve their wages, resorting, if necessary, to the protections afforded by the law.  And Mr. Nget's own testimony establishes how he felt about that activity: he labeled it "extortion."  (Tr. 72:5-11 (S. Nget testimony).)

The evidence also establishes that Mr. Nget knew, or at least believed, that the University Pl. employees intended to bring wage and hour claims as well.  (Tr. 239:18-241:22 (Qi Hua Lian testimony that S. Nget offered to give him a raise of $300 per month if Lian agreed to sign a document and told Lian that if

---

[9] "Ji Shun" is the Chinese for "Our Place."  (Tr. 130:25-131:6 (S. Nget