he sued, Nget would deny having spoken to Lian about a raise).)
Mr. Nget directly expressed his animus toward the activities in
which he believed the University Pl. workers were engaged by
saying that if he saw Qi Hua Lian or other workers protest in
front of the restaurant, he would cough up blood.  (Tr. 243:3-12
(Qi Hua Lian testimony).)

3. **Respondent Discharged the Delivery Workers in Response to Their Protected Activities**

Ke Yu Guan and Li Bing Xing both testified that on the
might of March 2, Simon Nget gave the delivery workers at
Amsterdam Ave. a choice, namely to accept a small raise and sign
a document that would resolve everything that had happened up to
that point, or to not accept that and to lose their jobs.  (Tr.
206:12-208:21 (Li Bing Xing testimony); Tr. 168:8-172:25 (Ke Yu
Guan testimony).)  Respondent admits that the offer of a raise
was made in exchange for the employees' relinquishment of their
wage and hour claims. (G.C. Exh. 3, p. 2 ("The employer made an
offer of additional compensation if the employees withdrew their
demands of over $2 million, claiming overtime").)  The delivery
men refused to accept the conditions offered, and were told they
did not have delivery jobs any more.  Simon Nget admitted on the
stand that if the delivery people had accepted his offer, he
would have kept them working.  (Tr. 82:5-11 (S. Nget testimony).)
Respondent's discharge of the Amsterdam Ave. workers because of
their refusal to abandon their wage and hour claims constitutes a
violation of Section 8(a)(1) of the Act.  *U Ocean Palace*

testimony).)

*Pavilion, Inc.*, 345 NLRB No. 97, slip op. at n.2 and p. 16 (2005) (employer's offer to hire applicants if they gave up their wage and hour claims and refusal to hire them otherwise established unlawful motivation).

The testimony of Qi Hua Lian establishes that the same motives that drove the decision to discharge all the Amsterdam Ave. delivery workers were at work in the decision to terminate the University Pl. employees as well. Simon Nget offered Qi Hua Lian a retroactive raise if Lian would sign a document. (Tr. 240:7-18 (Qi Hua Lian testimony).) Qi Hua Lian and at least one other worker refused to accept Mr. Nget's offer. (Tr. 242:23-243:25 (Qi Hua Lian testimony).) Further, Mr. Nget linked Lian's refusal to sign the document to Lian's participation in a lawsuit. (Tr. 241:19-22 (Qi Hua Lian testimony).) The following day, Mr. Nget discharged the University Pl. delivery employees. (Tr. 7922-24 (S. Nget testimony).) In the circumstances of the case, the timing of that decision makes it "stunningly obvious" that Mr. Nget's decision to discharge the University Pl. delivery workers was motivated by his concern that they intended to bring or had brought wage and hour claims against Respondent. *Gaetano & Associates*, 344 NLRB No. 65 (2005). "It is well settled that the timing of an employer's action in relation to known union activity can supply reliable and competent evidence of unlawful motivation." *Davey Roofing, Inc.*, 341 NLRB 222, 223 (2004) (unlawful layoffs on same day employer received pro-union petition). An inference that an

employer's motivation is unlawful is proper when---as here---the timing of a management decision is "stunningly obvious." *NLRB v. American Geri-Care*, 697 F.2d 56, 60 (2d Cir. 1982), cert. denied 461 U.S. 906 (1983).

The pretextual nature of Respondent's explanation of its reasons for firing all the delivery workers provides further support to the conclusion that the University Pl. delivery persons were fired for unlawful reasons.

According to Respondent's Answer to the Amended Complaint and response to the General Counsel's subpoena duces tecum, Respondent fired all of its delivery workers for economic reasons. (G.C. Exhs. 1(l) and (3).) Not only is this inconsistent with Respondent's Answer to the initial complaint, where Respondent admitted to firing the delivery workers because they sought more pay, (G.C. Exh. 1(g)), but Respondent offered no reason for the timing of its decision. In fact, according to Simon Nget's testimony, Respondent *reduced* the cost of its deliveries six months *before* it fired all the workers. (Tr. 135:15-17 (S. Nget testimony).) Thus, Respondent's delivery costs were lower than they had been during prior years when Respondent had offered delivery; it was only when the delivery workers engaged in protected activity that Respondent suddenly discovered that delivery was suddenly too expensive. Respondent additionally claimed that the containers for its delivery resulted in excessively large portions, (G.C. Exhs. 1(l) and 3), but those containers had been in use for at least two years, (Tr.

22

18:25-19:12 (S. Nget testimony)), and were the same containers as those used for take-out service, (Tr. 23:7-18 (S. Nget testimony)). If the portions of food were really so large that they substantially diminished Respondent's profit margin, that should have affected the take-out service as well, yet Respondent did not discontinue its take-out service or otherwise change the containers it used for either delivery or take-out. Further, Respondent admitted that delivery contributed substantially to viability of its business when Simon Nget said he was not sure the business could survive without delivery. (Tr. 103:14-104:11 (stipulation that about a month after firing the delivery workers, S. Nget said he wasn't sure his business would survive without delivery).) Accordingly, the economic defense offered by Respondent does not withstand scrutiny. *G & T Terminal Packaging Co.*, 326 NLRB 114, 122 (1998) ("When one considers that his labor costs were no different from preceding years, that the Union was not asking for any change in the wage rates, and that the Company's potato packaging operations were profitable in 1994 and 1995, the only conclusion…" is that the union's demand to execute a contract caused the employer to cease potato packaging).

That being so, Respondent's motive should be assumed unlawful. *Metropolitan Transportation Services*, 351 NLRB No. 43, slip op. at 3 (2007).

Because Respondent discharged all of its delivery workers because they pursued better working conditions, Respondent thereby violated Section 8(a)(1) of the Act. The Administrative

Law Judge so found, stating, "[I]t is my conclusion that Respondent decided to discharge all of its employees because he believed that at least some of them would initiate a lawsuit claiming wages under the Fair Labor Standards Act...that these discharges impinged on the protection afforded to employees under Section 7 of the Act[,] and therefore violated Section 8(a)(1) of the Act." (Exh. B to the Petition, p. 4, lines 1-5.)

Because the Administrative Law Judge so found, the Court should conclude that Petitioner has reasonable cause to believe that Respondent violated the Act as alleged in the Petition. *Silverman v. J.R.L. Food Corp.*, *supra*, 196 F.3d at 337 (district court must give "appropriate deference" to findings of Board ALJ).

### C. *Darlington* and Its Progeny Do Not Affect the Unlawfulness of Respondent's Discharge of the Delivery Workers

Respondent's decision to fire all of its delivery workers is most appropriately analyzed as a mass discharge case. As argued below, the analytical framework of *Textile Workers Union of America v. Darlington Mfg. Co.*, 380 U.S. 263 (1965) is simply inapplicable to the present case. However, even under the framework of *Darlington*, Respondent's actions still violated Section 8(a)(1) of the Act.[10]

---

[10] Although *Darlington* involved union activity, it appears the Board would apply the same analysis to a partial closing in a non-union, protected activity case. *Cub Branch Mining*, 300 NLRB 57, 61 n.20 (1990) (ALJ held that even if raised, *Darlington* would not preclude reinstatement of non-union, striking workers).

1. **Darlington and Its Progeny Do Not Apply to the Present Case**

The instant case does not involve a "partial closing" as that phrase is used in *Darlington* and succeeding cases.[11] The Respondent's decision did not involve any cessation of operations in its basic business. The Board has recognized that not every cessation of a part of an employer's business is a partial closing. For instance, the Board has distinguished subcontracting and "runaway shop" cases from partial closings on precisely the grounds that those former kinds of cases do not involve a cessation of *basic* operations. *See Lear Siegler, Inc.*, 295 NLRB 857, 860 (1989) (refusing to apply *Darlington*, the Board said, "The Respondent here, by significant contrast, did not cease operations"); *see also G & T Terminal Packaging Co.*, 326 NLRB 114, 122 (1998) (decision to cease potato packaging operations and allow another company to gain the sales the respondent previously had was *not* a partial closing).

In the context of refusals to bargain, the Board has explicitly warned against viewing an employer's business---and hence what counts as a cessation or significant alteration of operations---in excessively narrow terms. For instance, in *Bob's Big Boy Family Restaurants*, 264 NLRB 1369 (1982), the ALJ found a

---

[11] As an initial matter, it should be noted that the instant case does not involve any of the concerns regarding burdensomeness or entrepreneurial control that appear to underlie *Darlington* and succeeding cases. A "restoration" remedy involves nothing more than reinstatement of the delivery workers. The workers supplied their own means of transportation and there is no indication that Respondent had *any* capital investment tied up in operating the delivery service, outside of labor costs.

partial closing when the employer stopped processing shrimp, but the Board reversed.    The Board noted that it was "literally correct to say that [r]espondent was in the shrimp processing business …[but]… too narrow…. More accurately, [r]espondent is in the business of providing prepared foodstuffs to its individual restaurants."    264 NLRB at 1370-1371.    The Board then held that "the nature and direction of [the employer]'s business was not substantially altered" and that the employer's modification of its business was therefore amenable to collective bargaining. *Id.* at 1371.

In Section 8(a)(3) cases, the Board has affirmed analogous reasoning.    For instance, in *G & T Terminal Packaging*, *supra*, the respondent employer ceased packaging potatoes, sold its potato packaging machinery to another company, gave up a portion of its sales altogether, and allowed the company to which the machinery had been sold to take over at least 40% to 60% of the respondent's potato sales pursuant to the instructions of the respondent.    The ALJ found that the cessation of potato packaging operations was not a partial closing and the Board affirmed, finding a restoration remedy appropriate.    *See G & T Terminal*, *supra*, 326 NLRB at 122 (analogizing decision to let another business take over potato packaging and some of respondent's sales to "subcontracting": "a substantial portion of [r]espondent's potato sales after April 17 were essentially subcontracted"; respondent "effectively subcontracted out that work").    The ALJ's restoration order, which the Board affirmed,

specifically relied, not on subcontracting cases, but on a "curtailment case," *viz.*, *We Can, Inc.*, 315 NLRB 170 (1994)

The Board has also not hesitated to order a "restoration" remedy when an employer has simply stopped serving a particular kind of customer or species of its overall work, finding such to be no more than a curtailment or restriction of the employer's overall operations. *Allied General Services, Inc.*, 329 NLRB 568 (1999) (where employer fired entire bargaining unit and ceased engaging in non-retail sale, repair, and installation of commercial boilers, while continuing its rental of boilers, the Board noted the General Counsel's failure to seek a restoration remedy and, after inviting the parties to make submissions on the matter, ordered one *sua sponte*, "consistent with Board precedent," citing *We Can*, *supra*.)

Similar considerations apply in the instant case. Respondent has no more engaged in a "partial closing" than would be the case if a supermarket fired all its baggers. Respondent may have stopped providing a specific service to its customers, but that does not amount to a partial closing. Both Saigon Grill facilities remain open for business and the take-out business at Amsterdam Ave. has increased significantly after the delivery workers were fired. (*Compare* Tr. 21:8-14 (S. Nget testimony that take-out service currently accounts for 20%-25% of the restaurant's revenues) *with* Tr. 31:2-19 (S. Nget testimony that take-out accounted for about 10% of the restaurant's revenues before the delivery workers were fired).)

The shift of revenues from the delivery service to take-out strongly suggests that Respondent has "subcontracted" the movement of its food from the delivery workers to its customers, analogous to the effective subcontracting in *G & T Terminal Packaging* and thereby distinguishing the instant case from a partial closing.

The Board will also refuse to apply a *Darlington* partial closing analysis where an employer ceases or suspends operations temporarily. *Plaza Properties of Michigan*, 340 NLRB 983, 987 (2003) (citing cases). The instant case can be analyzed as a temporary closing, because Simon Nget's stated intent has been only to suspend operations until the employees' suit is resolved. (Tr. 105:9-106:10 (S. Nget admission that said he would reinstitute delivery service if he could do it in a "normal way," *viz.* without claims by workers for better wages).) Indeed, in *Darlington* the Supreme Court noted that the partial closing analysis did not apply to "a shutdown where the employees, by renouncing the union, could cause the plant to reopen." 380 U.S. at 273. Simon Nget's statement to the newspaper reporter strongly suggests that the instant case presents such a situation, where the employees could cause delivery service to resume by dropping their wage and hour claims.

2. **Even Under Darlington, Respondent's Discharge of Its Delivery Workers Was Unlawful**

If, notwithstanding the foregoing, the instant case is analyzed as a partial closing, then it would be Petitioner's burden to demonstrate that (1) Respondent intended to chill

28

protected activity among the remaining portions of the business, *i.e.*, among the remaining workers and (2) such chilling effect was reasonably foreseeable. *Darlington*, *supra*, 380 U.S. at 275. With respect to the first test, "The requisite motivation to chill may be provided by something less than direct evidence, which is rarely available in cases of this kind." *Darlington Mfg. Co.*, 165 NLRB 1074, 1083 (1967) In adducing such evidence, the General Counsel may rely on "the fair inferences arising from the totality of the evidence, considered in light of then-existing circumstances.". *Id.*

In *Purolator Armored, Inc.*, 268 NLRB 1268 (1984), *enfd.* 764 F.2d 1423 (11th Cir. 1985), the Board affirmed the ALJ's conclusion that the employer's closing of its coin room operations was unlawful under *Darlington*. In so concluding, the ALJ found the first element of the *Darlington* test was established by the predictability of the chilling effect on other employees: "I perceive the critical question to be whether the Employer's activities occurring herein make it realistically predictable that the remaining employees would fear closing or other cogent restrain upon the exercise of their Section 7 right." *Purolator Armored, supra,* 268 NLRB at 1289. The ALJ noted that (1) the remaining employees worked in the same building as the discharged workers, (2) the remaining workers were represented by the same union that represented the discharged workers, and (3) the employer had been overtly hostile to the organization activities of the coin room employees. *Id.*

In enforcing the Board's decision, the Eleventh Circuit said, "We are well aware that in the present case there must be a showing not only of anti-union animus, but of a motive to chill non-change-service employees.    Nevertheless, the anti-union animus displayed by Purolator's 8(a)(1) violations are important indications that Purolator's motive was to harm unionism." *Purolator Armored, Inc. v. NLRB*, 764 F.2d 1423, 1429 (11th Cir. 1985).    In the instant case, Respondent demonstrated its hostility toward the employees' protected activity by attempting to discourage that activity through both offers of raises and threats of discharge and by direct remarks of hostility, namely that Simon Nget would "cough up blood" if confronted by workers who insisted on pursuing a wage and hour claim.

Second, as in *Purolator* and *George Lithograph Co.*, 204 NLRB 431 (1973), the discharged workers worked out of the same facilities as the remaining workers and Simon Nget had reason to think that activities of the delivery workers would spread to others.    (Tr. 111:16-114:1 (S. Nget testimony that the delivery employees were all from the same town and related to one another and other workers at the restaurant).)    This is particularly so in light of the testimony that other workers were paid less than minimum wage.    (Tr. 276:17-277:12 (stipulation that witness would testify that she worked at University Pl. and was paid less than minimum wage until April 2007, when her wages were raised to above the minimum); Tr. 265:12-271:4 (testimony of Amsterdam Ave. worker Augustina De Jesus that she was paid $775 for 144 hours of

30

straight time, approximating $4.40 per hour after accounting for overtime, until April 2007, when her hours were reduced to 47 per week, bringing her pay rate to approximately $7.67 per hour, higher than the New York State minimum wage rate of $7.15 per hour for non-tipped employees).)   Indeed, it is an indication of Mr. Nget's concern that approximately a month after he fired the delivery workers and just a couple of weeks after those workers filed suit in federal court, he raised the wages of employees earning less than minimum wage.   (*Compare id. with* G.C. Exh. 9 (suit filed March 21, 2007).)

In such circumstances, "the chilling effect of the conduct [firing all the delivery workers] in issue was entirely a foreseeable---and hence intended---consequence of that conduct." *George Lithograph*, *supra*, 204 NLRB at 431-432.   However, there is also more direct evidence of Respondent's intent to chill other employees.   Simon Nget admitted that he oversaw some of the remaining employees receiving and signing a letter in which employees stated their loyalty to Respondent and distanced themselves from the protected activities of the delivery workers. (Tr. 126:22-127:5 and U. Exh. 5.)   Such conduct restrains and coerces employees in the exercise of their Section 7 rights. *Dentech Corp.*, 294 NLRB 924, 928 (1989).   That establishes that Respondent intended to chill remaining employees in the exercise of their Section 7 rights and that subsequently manifested intent should be imputed to the earlier discharge of the delivery workers.

In summary, Petitioner contends that the foregoing, on any analysis, establishes more than reasonable cause to believe that Respondent's discharge of the delivery workers and concomitant cessation of delivery services violated Section 8(a)(1) of the Act. That conclusion is strongly supported by the February 11, 2008 decision of the Administrative Law judge, which provides "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals." *Kaynard v. Mego Corp., supra* at 1033.

## VI.    JUST AND PROPER ANALYSIS

The Second Circuit has recognized that Section 10(j) is among those "legislative provisions calling for equitable relief to prevent violations of a statute" and courts should grant interim relief thereunder "in accordance with traditional equity practice, as conditioned by the necessities of public interest which Congress has sought to protect." *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980), *quoting Seeler v. The Trading Port, Inc.*, 517 F.2d at 39-40. In applying these principles, the Second Circuit has concluded that Section 10(j) injunctive relief is warranted where serious and pervasive unfair labor practices threaten to render the Board's processes "totally ineffective" by precluding a meaningful final remedy, *Kaynard v. Mego Corp.*, 633 F.2d at 1034 (discussing *Seeler v. The Trading Port, Inc.*, 517 F.2d at 37-38), or where the passage of time might otherwise allow the respondent to accomplish its unlawful objective before being placed under any legal restraint. *Kaynard*

32

*v. Palby Lingerie, Inc.*, 625 F.2d at 1055.  *Accord, Silverman v. Major League Baseball Player Relations Comm., Inc.*, 880 F.Supp. 246, 255 (S.D.N.Y. 1995), *aff'd* 67 F.3d 1054 (2d Cir. 1995).

Courts have recognized the lasting effect of employer misconduct such as that in the present case, which lingers in the collective memory of the shop.  *See, e.g., NLRB v. Electro-Voice, Inc.*, 83 F.3d at 1572 ("common sense recognizes the dramatic and long term effects of such activity"); *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208, 212-13 (2d Cir. 1980) ("hallmark violations," including 8(a)(3) and (1) discharges, are "likely to have a lasting inhibitive effect on a substantial percentage of the work force").  Unless interim reinstatement is promptly obtained for the discharged employees, the remaining workers will understand that union support or other protected activity will likely result in their discharge or other adverse consequences, and that neither the Board nor a union can effectively protect them.  *See Pye v. Excel Case Ready*, 238 F.3d 69, 74-75 (1st Cir. 2001); *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1053; *Silverman v. Whittal & Shon, Inc.*, 125 LRRM 2150, 2151 (S.D.N.Y. 1986). Injunctive relief under Section 10(j) is therefore just and proper.  The "serious adverse impact on employees' interest in unionization" created by the employer's unlawful discharge of those who participated in protected activity "is exactly the irreparable harm contemplated by Section 10(j)." *Pye v. Excel Case Ready*, *supra*, 238 F.3d at 74-75  (internal quotations and citations omitted); *see also NLRB v. Electro-Voice, Inc.*, 83 F.3d

at 1573 ("...the employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them"); *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1053 (discharge of known activists "risked a serious impact on employee interest in unionization"); *NLRB v. Atlas Microfilming, etc.*, 753 F.2d 313, 319 (3d Cir. 1985) (continuing impact of threats of plant closure well recognized; discharge of union activist and coercive interrogations also "must…be viewed as having a continuing impact").

Further, Nget's oversight of remaining employees signing a letter in which they stated their loyalty to the Employer and thus distancing themselves from the protected activities of the delivery workers, is further evidence of the "chilling" impact upon the remaining employees of the Respondent's violations.

Similarly, it has long been held that unlawful employee discharges that threaten to "nip" union organizing drives "in the bud" warrant interim injunctive relief on the ground that the reinstatement of such employees is necessary to avoid "serious adverse impact on employee interest in unionization." *Palby Lingerie*, 625 F.2d at 1052; *also Ahearn v. McGuire*, 1994 WL 721371, *8 (W.D.N.Y. 1994); *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988) ; *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 907 (3rd Cir. 1981).

Interim injunctive relief is also necessary to safeguard the public interest in protecting Section 7 rights.  It is the stated policy of the Act to "protect[] the exercise by workers of

full freedom of association, self-organizing, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." NLRA Sec. 1, 29 U.S.C. § 151. "The public interest in protecting concerted activity…, especially in its formative stages, is at stake here." *Eisenberg v. Lenape Products, Inc.*, 781 F.2d 999, 1007 (3d Cir. 1986) (diss. op.). The Employer's actions in the present case constituted "employer retaliation intended to destroy the bud of employee initiative aimed at bettering terms of employment and working conditions." *Hugh H. Wilson Corp. v. NLRB*, 414 F.2d 1345, 1347 (3d Cir. 1969), *cert. denied* 397 U.S. 935 (1970). The message sent by the Employer in discharging its delivery workers is not only "precisely the kind of message, and action, that the NLRA prohibits, it is the kind of message that cannot be effectively retracted even if the discharged employees are ultimately reinstated by the Board. Employees will not risk the uncertainty and hardship attendant upon even temporary lay-off if that is the price they must pay. . ." *Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 881 (3d Cir. 1990).

Respondent's employees engaged in fledgling efforts at collective action—efforts fully protected by Section 7 of the Act—and those initial efforts were met with the discharge of every individual perceived to be associated with or potentially sympathetic to such efforts. The chilling effect on employee exercise of Section 7 rights can be as easily inferred in these

circumstances as in the context of a full union organizing drive. The lesson to the remaining employees who witnessed the retribution visited upon those who dared exercise their Section 7 rights is no less effective.

Interim reinstatement is further necessary to prevent the permanent scattering of the discharged employees, which could preclude their ultimate reinstatement under a final Board order. *NLRB v. Electro-Voice, Inc.*, 83 F.3d at 1573; *Aguayo v. Tomco Carburetor*, 853 F.2d at 749. This perspective has found judicial support under Section 10(j). *See Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 299 (7th Cir. 2001); *Blyer v. Domsey Trading Corp.*, 139 LRRM 2289, 2291 (E.D.N.Y. 1991); *Silverman v. Reinauer Transportation*, 130 LRRM 2505, 2508 (S.D.N.Y. 1988), *aff'd per curiam* 880 F.2d 1319 (2d Cir. June 23, 1989) (unpublished). While the discharged employees currently desire reinstatement and are willing to resume their concerted, protected activities, that may well not be true at the time a final Board order issues, thereby rendering final relief ineffective.

Nor would interim reinstatement of the discharged employees be unduly burdensome on the Employer. The Employer would receive the benefit of the reinstated employees' labor, not to mention the fruits of its restored delivery service, and would retain the right to discipline any of the reinstate employees in a non-discriminatory manner. *NLRB v. Electro-Voice, Inc.*, *supra*, 83 F.3d at 1573; *Eisenberg v. Wellington Hall Nursing Home*, *supra*, 651 F.2d at 906.

36

The Employer's recent offer to some employees to return to work at significantly reduced work schedules does not adequately remedy the effects of its unfair labor practices. First, the Employer's sharp reduction in hours of the discriminatees serves only to emphasize to the other employees the cost of engaging in protected activity. Unless the discriminatees are returned to their former conditions of employment, Respondent will plainly communicate to the other workers exactly how much pain it can inflict on employees who dare assert their rights, and that demonstration will be visible to the other workers every day. That message is reinforced by the fact that the Employer has hired new delivery employees who are being permitted to work longer hours than the reinstated employees. (Exh. F, ¶ 11; Exh. G, ¶ 9.)

Second, the Respondent's failure to restore to the delivery workers their previous terms and conditions of employment, especially the reduced wages those employees would earn working an abbreviated schedule, produces a strong disincentive for the discharged employees to return to work. (Exh. L, ¶ 8.) Thus, Respondent's refusal to restore the former working conditions of the discharged workers makes the "scattering" of those individuals all the more likely, thereby resulting in frustration of the Board's ability to adequately remedy Respondent's unfair labor practices when, in due course, a final Board order is issued.

In summary, interim reinstatement of the named discharged delivery workers is just and proper because (i) without it, the passage of time will reinforce the message for the remaining employees that they cannot freely exercise the rights guaranteed them by the law, thereby rendering the Board's remedial powers ineffective and (ii) the discharged employees may scatter, precluding their reinstatement and thereby allowing Respondent to accomplish its unlawful objective.

### VII.   CONCLUSION AND REMEDY

Given, first, the well-established propriety of the interim relief sought by the Petition in the circumstances of this case and, second, the substantial evidence supporting that Respondent has violated the Act as alleged in the Petition, there is plainly both reasonable cause to believe that Respondent has violated the Act and that interim reinstatement is just and proper. Petitioner therefore seeks an order requiring that, pending the Board's final adjudication of the underlying charge, Respondent cease and desist from discharging employees in response to their protected, concerted activities.   Specifically, Petitioner requests an order enjoining Respondent from:

> (a)   Discharging employees in retaliation for their concerted, protected activities; and
> (b)   In any like or related manner interfering with, restraining or coercing its employees in the rights guaranteed them under Section 7 of the Act.

Petitioner further requests an affirmative order requiring Respondent, pending final Board adjudication, to

> (a)   Within five (5) days of the issuance of the Court's Order, restore the Employer's delivery services at

620 Amsterdam Ave. and 93 University Place and offer Jian Yun Chen, Yu Ming Yu, Ming Hua Chen, Li Qiang Lin, Chen Shu Hui, and Chen Guo Jin immediate interim reinstatement to their former positions with the Employer, displacing if necessary, any workers contracted for, hired, or reassigned to replace them;

(b)    temporarily    expunge    any    references    to    the discharges of the delivery workers from their personnel files and not rely on such discharges in any future discipline imposed prior to a final Board order;

(c) ·post copies of the District Court's opinion and order, together with a Chinese translation prepared at the Employer's expense and approved by the Regional Director of Region 2 of the Board, at the Employers' facilities where notices to employees are customarily posted; maintain such postings during the Board's administrative proceeding free from all obstructions and defacements; allow all employees free and unrestricted access to said postings; and grant agents of the Board reasonable access to Respondent's facilities    to    monitor    compliance    with    this    posting requirement;[12] and

(d)    Within twenty (20) days of the issuance of the District Court's Order, file with the Court, with a copy submitted to the Regional Director of Region 2 of the National Labor Relations Board, a sworn affidavit from a responsible    Respondent    official    setting    forth    with specificity the manner in which the Respondent has complied with the terms of this decree.

Dated at New York, New York
April 3, 2008

Jamie Rucker
Counsel for Petitioner
National Labor Relations Board
Region 2
26 Federal Plaza, Room 3614
New York, New York 10278-0104
(212) 264-0300

Ronald Meisburg, General Counsel
Barry J. Kearney, Associate General Counsel
Ellen A. Farrell, Deputy Associate General Counsel
Judith I. Katz, Assistant General Counsel
Karen P. Fernbach, Regional Attorney, Region 2
Donald B. Zavelo, Deputy Regional Attorney, Region 2

---

[12] See, e.g., Asseo v. Centro Medico Del Turabo, Inc., 900 F.2d 445, 454 (1st Cir. 1990); Blyer v. Domsey Trading Corp., 1991 WL 150817, 139 LRRM 2289, 2292 (E.D.N.Y. 1991).